IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHARON DENISE LEE, | ) | CASE NO. 1:17-cv-02708 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Sharon Denise Lee ("Plaintiff" or "Lee") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision for further consideration of Lee's physical impairments.  Without further analysis of the medical evidence regarding the worsening of Lee's foot impairment in the period following review by state agency physicians, it cannot be determined whether the sedentary RFC is supported by substantial evidence.  The undersigned finds no error in the ALJ's assessment of Lee's mental health impairments.

## I.  Procedural History

On September 29, 2014, Lee protectively filed[1] applications for DIB and SSI.[2]  Tr. 18, 309-312, 313-318.  She alleged a disability onset date of May 9, 2013, (Tr. 18, 76), and she alleged disability due to complications from a gunshot wound, bipolar disorder, anxiety disorder, depression, ankle problem, and gunshot wound to left foot (Tr. 135-136, 171, 215, 224, 341).  After initial denial by the state agency (Tr. 214-222) and denial upon reconsideration (Tr. 224-229), Lee requested a hearing (Tr. 230).  On May 9, 2016, (Tr. 35-72), and on September 21, 2016, (Tr. 73-112), Administrative Law Judge Penny Loucas ("ALJ") conducted administrative hearings.[3]

On December 16, 2016, the ALJ issued an unfavorable decision (Tr. 15-34), finding that Lee had not been under a disability within the meaning of the Social Security Act from May 9, 2013, through the date of the decision (Tr. 19, 29).  Lee requested review of the ALJ's decision

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 11/30/2018).

[2] Lee had previously filed an application for social security disability benefits in 2011.  Tr. 18.  That application was denied in an ALJ decision dated May 7, 2013.  Tr. 18.  Lee does not challenge the ALJ's consideration of the prior decision under the principles enunciated in *Dennard v. Sec'y of Health & Human Services*, 907 F.2d 598 (6th Cir. 1990) and *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).  The Sixth Circuit recently explained that:

> The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications—apply to individuals *and* the government.  At the same time, they do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.

*Early v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018) (emphasis in original).

[3] At the conclusion of the May 9, 2016, hearing the ALJ indicated that she was going to continue the hearing to allow for submission and review of additional medical records and, depending on that review, a further hearing might be warranted.  Tr. 70.

by the Appeals Council. Tr. 304-308.  On October 27, 2017, the Appeals Council denied Lee's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Lee was born in 1973 and was 43 years old at the time of the hearings.  Tr. 27, 82.  Prior to moving to Ohio in 2015, Lee lived in Oklahoma.  Tr. 82-83, 91.  Lee decided to move to Ohio because her family was in Ohio and she needed their help due to problems with her foot.  Tr. 91-92. Lee was living by herself at the time of the September 2016 hearing.  Tr. 92.  Her sister came over to her home to assist her.  Tr. 92.

Lee attended college and received an associate's degree in computers.  Tr. 39, 82.  Lee never held a job using her college degree.  Tr. 39, 82.  She worked at Malley's Chocolates, primarily as a packer.  Tr. 39-41, 83-84.  She worked other jobs at different companies, including a position that involved providing home health care services for elderly clients, e.g., cleaning, shopping, bathing.  Tr. 41-45, 84-87.  Lee also worked in a retirement home serving food to the residents.  Tr. 45, 87-88.  She stopped working at the retirement home in 2011.  Tr.  45-46, 89. Lee indicated that she stopped working at the retirement home because her foot started bothering due to there being a lot of standing associated with the position (Tr. 45-46) but she also indicated that she recalled being fired from the position because she could not make it to work due to transportation problems (Tr. 89).  In 2010 and 2011, Lee also worked part-time as a greeter at a construction company.  Tr.  89-90.  The greeter position involved providing directions.  Tr. 90.

### B.    Medical evidence

#### 1.    Treatment records

*Physical impairments*

On May 21, 2013, Lee presented to a medical clinic as a new patient with complaints of left foot pain.  Tr. 406.  Lee saw nurse practitioner Lindsey Groves.  Tr. 406-408.  Lee explained she had been shot in the foot in 1994 as an innocent bystander.  Tr. 406.  She required corrective surgery which entailed using tissue from her abdomen to reconstruct her injured foot and a skin graft taken from her thigh.  Tr. 406.  Lee relayed that she always had discomfort in her foot but it had been getting worse.  Tr. 406.  Lee explained that the pain was worse with rainy weather and indicated she had been informed she had arthritis in her foot.  Tr. 406.  On physical examination, Nurse Groves observed severe disfigurement and swelling in Lee's left foot.  Tr. 407.  Lee's surgical scars and skin graft were apparent.  Tr. 407.  Lee's foot was tender to touch and Lee had a decreased range of motion in her foot but her toes moved freely.  Tr. 407.  Lee exhibited pain with range of motion and tenderness was observed with ambulation.  Tr. 407.  Nurse Groves assessed left foot pain, benign essential hypertension and depression.  Tr. 408.  Nurse Groves prescribed diclofenac for Lee's foot pain and advised Lee to follow up in two weeks.  Tr. 408.

Lee followed up with Nurse Groves on July 1, 2013.  Tr. 404-406.  Lee reported that the diclofenac was helping some but she had shooting pain with every step that she took.  Tr. 404.  She was having a difficult time climbing stairs.  Tr. 404.  On physical examination of Lee's foot, Nurse Groves observed no changes since the prior assessment.  Tr. 405.  Nurse Groves started Lee on a trial of Neurontin and ordered an x-ray of Lee's left foot.  Tr. 406.  Nurse Groves noted that Lee's depression was stable and improved.  Tr. 406.

Lee had the x-ray of her left foot taken on July 1, 2013.  Tr. 419.  The x-ray showed marked soft tissue swelling dorsal medial aspect of midfoot with postsurgical and posttraumatic changes and retained gunshot wound shrapnel.  Tr. 419.

4

Lee saw Nurse Groves again on July 15, 2013.  Tr. 402-404.  Lee reported that her foot had been sore and swollen with the recent rainy weather.  Tr. 402.  On physical examination of Lee's foot, Nurse Groves observed no changes since the prior assessment.  Tr. 403.  Nurse Groves made no changes to Lee's medication regimen.  Tr. 404.

On August 14, 2013, Lee saw Patrick F. Kelly, D.O., of Oklahoma State University Medical Group Orthopedics, for her left foot pain.  Tr. 409-412.  Lee explained that the pain radiated to her left calf and the pain was sharp and throbbing.  Tr. 409.  Lee's pain was aggravated by climbing stairs, sitting, walking and standing and her pain was relieved with elevation.  Tr. 409.  Associated symptoms included waking at night, numbness, swelling and tingling in her legs.  Tr. 409.  Dr. Kelly ordered an x-ray of the left foot; assessed midfoot arthritis acute; and referred Lee to orthopedics.  Tr. 412.

On October 17, 2013, Lee saw Dr. Asim Maqsood, M.D., at the medical clinic in Oklahoma for medication refills.  Tr. 398-399.  Lee relayed chronic pain in her left foot with a callus on the sole.  Tr. 398.  Lee did not feel that her medication regimen was working for her.  Tr. 398.  Lee reported she had been having tingling and numbness in fingers in her left hand for about one to two weeks.  Tr. 398.  Dr. Maqsood prescribed a wrist splint for possible carpal tunnel syndrome; renewed the Neurontin prescription; prescribed Mobic in place of diclofenac; and referred Lee to a podiatrist for management of her callus.  Tr. 399.

There is a gap in treatment until September 4, 2015, when Lee sought treatment at MetroHealth Medical Center as a new patient with complaints of foot/toe symptoms.  Tr. 687-689.  Lee saw Christ'l Howze, a physician assistant.  Tr. 689.  Lee was seeking a referral to podiatry.  Tr. 687.  She also complained of tingling in fingers in her left hand since she broke her wrist about three years earlier.  Tr. 687.  Lee was referred to podiatry and an x-ray of her left foot

was ordered.  Tr. 689.  The left-foot x-ray showed dorsal soft tissue swelling; surgical staples and clips; metallic densities in the soft tissues; no acute fracture of dislocation; deformity and degenerative changes; and degenerative spurring.  Tr. 692.

On October 20, 2015, Lee was seen at the Physical Medicine and Rehabilitation ("PM&R") department at MetroHealth for evaluation of her left foot gunshot wound.  Tr. 700-704.  Lee saw Dr. Neyha Cherin, D.O.  Tr. 704.  Lee complained that, with walking, she had shooting pain from the medial foot (area of gunshot) up the calf and stopping right above the knee.  Tr. 701.  Lee relayed that she had to walk on the lateral part of her foot to avoid the pain.  Tr. 701.  Her pain was alleviated by not walking on it and Motrin helped but only for a moment.  Tr. 701.  Lee's pain was constant and varied in intensity.  Tr. 701.  She reported numbness and tingling in the sole of her foot.  Tr. 701.  Lee was independent with ambulation but reported using a cane for long distances and indicated she could get off balance if she was walking long distances.  Tr. 701.  Physical examination of Lee's left ankle/foot showed positive non-pitting edema over the medial dorsal aspect of her foot; palpation was soft and mobile with a feeling of fluid collection under the graft site; there was a foul odor from the left foot; there was tenderness to palpation from the medial ankle to the area over the bone graft to the sole of the medial foot; and there was decreased dorsiflexion.  Tr. 703.  Dr. Cherin noted concern over the possibility of underlying fluid collection near the graft site.  Tr. 703.  Dr. Cherin recommended physical therapy for the ankle to help strengthen the musculature and provide proper gait training but advised against starting physical therapy until the fluid collection was addressed with podiatry.  Tr. 703.  Dr. Cherin recommended that Lee follow up with podiatry.  Tr. 703.  Topamax was prescribed for nerve pain and Lee was advised to continue elevating her left foot and applying ice to the left foot when resting.  Tr. 703-704.

Lee saw Dr. Leslee A. Ruszkowski, DPM, of Cleveland Foot and Ankle, on November 19, 2015, regarding her left foot pain.  Tr. 607-610.  Lee complained of sharp pain that started at the bottom of her foot and radiated up her leg.  Tr. 607.  She rated her pain an 8 out of 10 and explained that her foot pain had affected the way she walked.  Tr. 607.  Physical examination showed mild edema, decreased range of motion in the ankle and toes, and severe collapse of the left medial longitudinal arch.  Tr. 609.  Dr. Ruszkowski indicated that weight bearing x-rays of the left foot showed no soft tissue swelling, increase in density, or gas but there were severe post-traumatic arthritic changes noted at the navicular/cuneiform joint and metallic staples and wires from the prior surgery were noted.  Tr. 609.  Dr. Ruszkowski assessed left foot pain; callus on the plantar aspect of the foot; localized primary osteoarthritis of the left ankle; and post-traumatic foot deformity.  Tr. 609.  The hyperkeratoses under Lee's left midfoot and sub-5[th] metatarsal were debrided and horseshoe pads were put into place to offload the pressured areas.  Tr. 609.  Lee was advised to return in one week for a surgical consult regarding reconstruction of her left-foot deformity.  Tr. 609.  Lee was also advised to return to podiatry in two months for follow up care.  Tr. 609.

 On January 4, 2016, Lee saw Dr. Jeffrey M. Whitaker, DPM, for a surgical consult regarding her left foot.  Tr. 604-606.  Lee relayed that she was taking Neurontin and Topamax for nerve pain without relief.  Tr. 605.  Lee reported that her pain was constantly intolerable and even worse with walking.  Tr. 605.  On physical examination, Dr. Whitaker observed a large soft tissue mass present on the medial dorsum of Lee's left foot; graft tissue was visible and present on the large tissue mass; and the tissue mass had multiple scars from traumatic surgery.  Tr. 606.  Lee had limited range of motion in her left ankle and pain in her midfoot with any motion of the left foot near the soft tissue mass.  Tr. 606.  Dr. Whitaker administered nerve block injections.

Tr. 606.  Dr. Whitaker provided Lee with a prescription for a custom AFO (ankle-foot orthosis) to accommodate the soft tissue mass on her left foot and limit ankle movement.  Tr. 606.  Dr. Whitaker suggested follow up in a couple of weeks.  Tr. 606.

Lee followed up with Dr. Myron Bodman, DPM, on February 4, 2016.  Tr. 603-604.  Lee rated her pain a 9 out of 10.  Tr. 603.  She reported only a few days of relief following the injections that were administered at her last visit.  Tr. 603.  She was expecting to get her AFO the following week.  Tr. 603.  Lee was taking Neurontin and Topamax but reported that it was not working.  Tr. 603.  Lee was interested in getting a cane because she was experiencing some instability.  Tr. 603.  Dr. Bodman observed hyperkeratotic tissue.  Tr. 604.  The hyperkeratotic tissue was paired with use of tissue nippers and blade without incident.  Tr. 604.  Dr. Bodman ordered an MRI to examine the extent of the soft tissue mass.  Tr. 604.  He instructed Lee to obtain the AFO because it would help decrease her pain and improve her ambulation.  Tr. 604.  Dr. Bodman provided Lee with a prescription for a cane.  Tr. 604.

On February 23, 2016, Lee saw Dr. Antwon Morton, D.O., at the PM&R Clinic for follow up.  Tr. 725-732.  Lee reported no change in her left foot pain since being seen at the PM&R Clinic.  Tr. 726.  She relayed that she recently had an MRI of her left foot which was ordered by an outside podiatrist.  Tr. 726.  Lee explained that she was taking Topamax and Gabapentin without relief and she was having intense pain in her left thigh at night which was disrupting her sleep.  Tr. 726.  Lee indicated that she limped intermittently secondary to pain.  Tr. 726.  She reported that she had recently been prescribed a single-point cane by podiatry.  Tr. 726.  Lee reported her pain level to be a 6 out of 10.  Tr. 726.  Dr. Morton noted that Lee's prior level of ambulation was independent and her current level of ambulation was independent but she did have a cane that she used for long distance and she could get off balance if she was

8

traveling long distances.  Tr. 726.  Dr. Morton increased Lee's dosage of Topamax and advised her to discontinue the Gabapentin.  Tr. 729.  Dr. Morton advised Lee to follow up with podiatry as scheduled and to continue to work on balance, strength, range of motion, and gait and to use her cane as needed for support while ambulating.  Tr. 729.

Lee saw Dr. Bodman on February 25, 2016, to review the MRI results.  Tr. 601-603.  Dr. Bodman indicated that the MRI showed a 10cm lipomatous mass.  Tr. 602-603.  During the visit, Lee reported her pain was a 7 out of 10.  Tr. 601.  She had recently obtained her AFO and relayed that it had helped her ambulate and caused a slight reduction in her pain.  Tr. 601.  Lee reported having some pain in her thigh which, like the pain in her foot, was burning, tingling and shooting.  Tr. 601.  Dr. Bodman debrided hyperkeratotic tissue.  Tr. 602.  Dr. Bodman prescribed a topical pain compound for Lee to apply to her foot and he instructed her to continue to wear her AFO.  Tr. 602.  Lee was advised to return to see Dr. Ehredt for a surgical consult.  Tr. 602.

On March 9, 2016, Lee saw Dr. Duane Ehredt, Jr., DPM, of University Hospitals Case Medical Center, for a surgical consult regarding the soft tissue mass on her left foot.  Tr. 787-789.  Before proceeding with surgical reconstruction, Dr. Ehredt advised that a biopsy should be obtained.  Tr. 789.  The biopsy was conducted on March 25, 2016.  Tr. 623-632.  Following the biopsy, Lee saw Dr. Ehredt on April 6, 2016.  Tr. 785-786.  Dr. Ehredt explained that the biopsy showed lipoma and discussed surgical treatment options for excision of the soft tissue mass and reconstruction with Lee.  Tr. 786.

Lee saw Dr. Morton for follow up on March 31, 2016.  Tr. 941-947.  Lee complained of constant pain and swelling at the site of her gunshot wound.  Tr. 945.  She was continuing to follow up with podiatry.  Tr. 945.  Dr. Morton noted no signs of infection and continued to recommend physical therapy for the ankle to strengthen the musculature and provide proper gait

training and close follow up with podiatry.  Tr. 945.  Dr. Morton increased Lee's Topamax and recommended that she continue to use her cane as needed for support when ambulating.  Tr. 945.

Lee saw Dr. Rachel E. Johnson, DPM, at Cleveland Foot and Ankle on June 22, 2016. Tr. 972-974.  Lee complained of painful calluses on both of her feet.  Tr. 972.  Lee felt relief when her calluses weree trimmed down.  Tr. 972.  Lee described her pain as a 10 out of 10.  Tr. 972.  Lee relayed that the AFO had relieved some of her pain but not all of it.  Tr. 972.  Lee also relayed that her pain management doctor was sending her to physical therapy to help with her foot pain.  Tr. 972.  On physical examination, Lee had a decreased range of motion in her feet and 4/5 muscle strength on the left.  Tr. 974.  Lee reported that she was interested in reconstructive surgery with Dr. Ehredt because her pain was unbearable.  Tr. 973.  During the visit, Lee's hyperkeratotic lesions were debrided.  Tr. 974.  A surgical consult was provided.  Tr. 974.

Lee saw Dr. Ehredt on July 6, 2016, for a surgical consult.  Tr. 971-972.  Lee consented to excision of the lipoma on her left foot.  Tr. 972.

On July 8, 2016, Lee presented for a physical therapy appointment.  Tr. 1067-1069.  Due to Lee's reported upcoming surgery and the severity of Lee's pain, it was agreed that the physical therapy evaluation would be put on hold until after the surgery.  Tr. 1067.

Lee underwent surgery for excision of the lipoma on August 12, 2016, at UHRH Richmond Medical Center.  Tr. 976-1009, 1014-1064.  Lee saw Dr. Ehredt for a post-surgical visit on August 17, 2016.  Tr. 1107-1108.  Lee was using crutches and wearing a cast on her left foot.  Tr. 1108.  Lee reported her pain level was a 10 out of 10.  Tr. 1107.  Lee had a hematoma on her left foot, which Dr. Ehredt aspirated and treated.  Tr. 1107.  Lee saw Dr. Ehredt the following week on August 24, 2016, and reported she was doing okay but she was still having

pain.  Tr. 1109-1111.  Lee was using crutches and wearing a surgical shoe.  Tr. 1110.  Lee's pain

level was an 8 out of 10.  Tr. 1109.  She was having trouble sleeping.  Tr. 1109.  She was taking

Ibuprofen but it was not really helping.  Tr. 1109.  Dr. Ehredt observed formation of a full

thickness flap necrosis which he indicated would require debridement.  Tr. 1111.  Lee consented

to further surgery and Dr. Ehredt indicated that Lee would be scheduled for surgery to debride

the dead tissue on her left foot.  Tr. 1111.

Dr. Ehredt performed the surgical debridement on August 29, 2016.  Tr. 1076-1105.  Lee

followed up with Dr. Ehredt on September 12, 2016.  Tr. 1115-1116.  Dr. Ehredt noted that

home health care had been performing dressing changes and Lee was following her post-op

instructions.  Tr. 1115.  In the "review of systems" section, Dr. Ehredt noted "Systemic: General

overall feeling is good.  Not feeling tired (fatigue).  No fever and no chills" and

"Gastrointestinal: No nausea and no vomiting."  Tr. 1115.  Dr. Ehredt observed that the silicone

was intact to the integra graft and there appeared to be excellent granulation tissue underneath.

Tr. 1115.  Dr. Ehredt indicated that Lee would need to continue with the wound VAC for another

two weeks.  Tr. 1115.  Dr. Ehredt changed Lee's wound VAC during the visit and indicated he

would see her back in two weeks for another VAC change and possible planning for further

surgical debridement.  Tr. 1115.  Home health care would continue in the interim.  Tr. 1115.

*Mental health impairments*

While residing in Oklahoma, starting in 2011 and continuing through her alleged onset

date of May 2013, Lee was receiving treatment through Counseling and Recovery Services for

her mental health conditions, which included depression, paranoia, PTSD, and panic disorder.

Tr. 434-474, 492-545.  Dr. Charles D. Van Tuyl, M.D., was one of her treatment providers.  Lee

continued to receive treatment through Counseling and Recovery Services through March 2015.

Tr. 475-488, 598-599.  During a May 7, 2013, visit, Lee was living in a shelter and was depressed.  Tr. 473.  Her diagnoses were PTSD, major depression, and panic disorder.  Tr. 473. Lee was taking various medications, including Wellbutrin, Celexa, Artane, Elavil, Clonidine, and Prolixin.  Tr. 473.  During a June 14, 2013, visit, Lee reported that she was starting to hear voices again and Wellbutrin was helping some with her depression but not quite enough.  Tr. 475.  Lee's Wellbutrin was increased.  Tr. 475.  During a November 12, 2013, visit, Lee indicated that her depression and PTSD symptoms were under good control but she was having trouble sleeping.  Tr. 479.  Ambien was added to Lee's medications.  Tr. 479.  The following month, Lee reported that she could not afford the cost of Ambien and she was not sleeping well. Tr. 481.  She was hearing voices and her mother felt that she was hyperactive.  Tr. 481.  During the visit, Lee appeared calm but some mild involuntary movements of her tongue and upper extremities were noted.  Tr. 481.

In April 2014, Lee reported she had been off her medication for about a week and became very depressed.  Tr. 483.  She had a brief inpatient stay because of a breakup with her boyfriend but indicated that was now in the past.  Tr. 483.  On June 12, 2014, Lee reported that she was doing well on her current medications and had only a little anxiety.  Tr. 485.  She was interested in an antidepressant and something to increase her appetite because she felt she was not eating enough.  Tr. 485.  During the visit, she seemed fairly cheerful.  Tr. 485.

During a September 11, 2014, visit, Lee reported insomnia and depression and she was isolating herself in her apartment.  Tr. 487.  On mental status examination, Lee's thought content was depressive, her attention and concentration were fair, her recent and remote memory were fair, her mood was anxious and depressed, her affect was flat and she looked tired.  Tr. 487.  Lee reported no suicidal ideation.  Also, on September 11, 2014, Dr. Van Tuyl provided a letter

indicating that Lee was a client of Counseling and Recovery Services and "[d]ue to mental health symptoms [Lee] is unable to maintain paid or volunteer work at this time." Tr. 490.  The following month, on October 16, 2014, Lee reported that her depression, flashbacks and insomnia were under adequate control.  Tr. 544.

During a March 5, 2015, visit, with the exception of a finding that Lee's mood was dysthymic and her energy level was low, Dr. Van Tuyl's mental status examination findings were unremarkable.  Tr. 599.  He observed that Lee's attention span and concentration were good and her recent and remote memory were good.  Tr. 599.  Lee's thought process was logical and her thought content was normal.  Tr. 599.

When Lee moved to Ohio, she established care with the Center for Families and Children for treatment of her mental health issues.  Tr. 549-596.  During an Adult Intake session on July 28, 2015, Lee indicated she was seeking services because of PTSD, depression and schizophrenia.  Tr. 553.  A psychiatric evaluation was conducted on August 26, 2015.  Tr. 549-551.  Lee relayed that she had been off medication at least a month.  Tr. 550.  She indicated that her prior medication regimen had helped control her symptoms and she hoped to get back on the same regimen.  Tr. 550.  Lee had no suicidal ideation, intent or plan and was not at imminent risk to herself or others but it was determined that Lee would benefit from restarting some of her medications.  Tr. 550.  Lee was started on Wellbutrin, Risperadal and Trihexyhendyl for her schizoaffective disorder and started on Trazadone for her PTSD.  Tr. 551.  Celexa and Elavil would be considered in the future.  Tr. 551.

During a visit on September 23, 2015, Lee reported that she was doing well on Wellbutrin, Trazadone, and Risperdal.  Tr. 571.  She reported being stressed due to multiple social issues including housing, food and employment.  Tr. 571.  She reported passive death

wishes but no plan or intent.  Tr. 571.  Lee indicated she had been mildly depressed because she thought things would have been better when she came back to Ohio but they were about the same as they were when she was in Oklahoma.  Tr. 571.  Lee's medications were continued.  Tr. 572.  Lee continued to receive support from a case worker concerning family issues, transportation, and other concerns that Lee raised.  Tr. 574-589.

On February 10, 2016, Lee attended a psychiatric appointment.  Tr. 590-591.  Lee saw a new provider, Emily Grimm, NP, because her past provider had left the agency.  Tr. 591.  Lee reported that she had been more anxious, she could not sleep, her auditory hallucinations were partially controlled with medication, and she was having nightmares.  Tr. 590.  Nurse Grimm made some adjustments to Lee's medications.  Tr. 591.

Lee saw Nurse Grimm on March 10, 2016.  Tr. 770-771.  Lee reported that her mood had been up and down.  Tr. 770.  Nurse Grimm observed that Lee presented with a depressed but stable mood; Lee continued to express auditory hallucinations and anxiety symptoms; Lee was having problems sleeping; and Lee appeared slightly distracted or internally stimulated at times.  Tr. 771.  Lee had undergone a sleep study but did not have the results yet.  Tr. 771.  Lee was having some family conflicts but felt that her sister was a support for her.  Tr. 770.  Nurse Grimm continued Lee on Wellbutrin, Risperdal and Trazadone.  Tr. 771.

Lee saw Erin Murphy, NP, for a psychiatric visit on June 16, 2016.  Tr. 959-960.  Lee needed refills on her medications.  Tr. 959.  She reported being depressed a lot; being around a lot of people made it worse and she was in a lot of pain.  Tr. 959.  Nurse Murphy continued Lee's prescriptions for Wellbutrin, Risperdal and Trazadone.  Tr. 960.

Lee saw Nurse Grimm on July 20, 2016.  Tr. 966-967.  Lee indicated that her depression was up and down.  Tr. 966.  She felt it could be related to the violence in her neighborhood.  Tr.

966.  Lee was feeling paranoid in the evenings due to the neighborhood shootings.  Tr. 966.  She was averaging about six hours of sleep each night.  Tr. 966.  A sleep study had confirmed sleep apnea but Lee was not wearing her CPAP because she felt claustrophobic.  Tr. 966.  Lee denied suicidal or homicidal ideation and felt that her medications were helping.  Tr. 966.  She was anxious about her upcoming foot surgery.  Tr. 966.  Her appetite was stable and she had recently attended a family party and had fun.  Tr. 966.  Nurse Grimm continued Lee's prescriptions for Wellbutrin, Risperdal and Trazadone.  Tr. 967.

2.     **Opinion evidence**

With the exception of Dr. Van Tuyl's September 11, 2014, letter, stating that he felt that Lee was unable to maintain paid or volunteer work due to her mental health symptoms, the record contains no treating source opinions and no examining source opinions.  The opinions rendered by the state agency reviewing physicians/psychologists are detailed below.

*Physical impairments*

On November 24, 2014, state agency reviewing physician Shelly Venters, MD, completed a Physical RFC Assessment.  Tr. 145-148.  In that assessment, Dr. Venters opined that Lee could occasionally lift/carry 10 pounds and frequently lift/carry less than 10 pounds; stand and/or walk for a total of 2 hours; sit about 6 hours in an 8-hour workday; and push/pull unlimitedly, other than as shown for lift/carry.  Tr. 146.  With respect to postural limitations, Dr. Venters opined that Lee could never climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and had no balancing limitations.  Tr. 146.  Dr. Venters found no manipulative, visual, communicative or environmental limitations.  Tr. 146-147.

Upon reconsideration, on February 26, 2015, state agency reviewing physician Ronald Davis, MD, affirmed Dr. Venters' Physical RFC Assessment.  Tr. 182-185.

_Mental health impairments_

On November 24, 2014, state agency reviewing psychologist Burnard Pearce, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 142-144) and Mental RFC Assessment (Tr. 148-150).  In the PRT, Dr. Pearce opined that Lee had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration.  Tr. 143.

In the Mental RFC Assessment, in the area of understanding and memory limitations, Dr. Pearce found that Lee was moderately limited in her ability to understand and remember detailed instructions but not significantly limited in her ability to remember locations and work-like procedures or in her ability to understand and remember very short and simple instructions.  Tr. 148.

In the area of sustained concentration and persistence limitations, Dr. Pearce found that Lee was markedly limited in her ability to carry out detailed instructions and moderately limited in her ability to maintain attention and concentration for extended periods, but she was not significantly limited in her ability carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 148-149.

In the area of social interaction limitations, Dr. Pearce found that Lee was markedly limited in her ability to interact appropriately with the general public but not significantly limited in her ability to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Tr. 149.

Dr. Pearce found that Lee had no adaptation limitations.  Tr. 149.

Dr. Pearce provided further explanation for his Mental RFC Assessment, stating that Lee could perform simple tasks with routine supervision; could relate to supervisors and peers on a superficial work basis; could not relate to the general public; and could adapt to a work situation. Tr. 149-150.

Upon reconsideration, on February 19, 2015, state agency reviewing psychologist Edith King, Ph.D., completed a PRT (Tr. 179-182) and Mental RFC Assessment (Tr. 185-187).  Dr. King's PRT and Mental RFC Assessment affirmed the findings of Dr. Pearce.  When providing further explanation for her Mental RFC Assessment, Dr. King, like Dr. Pearce, indicated that Lee could perform simple tasks with routine supervision; could relate to supervisors and peers on a superficial work basis; could not relate to the general public; and could adapt to a work situation. Tr. 187.  Dr. King added that Lee appeared to fluctuate from mild to moderate to severe mental symptoms from time to time and, overall, Lee's instability would indicate she would be able to handle simple work tasks with some restrictions in contacts with others.  Tr. 187.

**C.**     **Hearing testimony**

    **1.**     **Plaintiff's testimony**

Lee testified and was represented at the hearings held on May 9, 2016, (Tr.  38-63), and September 21, 2016 (Tr. 80-105).

*May 9, 2016, hearing*

Lee indicated that she was unable to work because she cannot stand and cannot sit for very long and she does not get along with people and does not like crowds.  Tr. 56.  On a typical day, Lee explained that she elevates her foot, eats and watches some television.  Tr. 57.  Her sister helps her with household chores and shopping because her foot was getting worse.  Tr. 57, 61.  If Lee goes shopping, she uses one of the motorized scooters.  Tr. 61.  Lee lives in a two-story home.  Tr. 61.  She climbs the stairs by holding onto the railing and using her cane.  Tr. 61.  Lee does not drive.  Tr. 61-62.

Lee explained that she had surgery in March 2016 on her left foot.[4]  Tr. 48-49.  Following her surgery, she was required to wear a brace that fit on the inside of her shoe and extended to her knee.  Tr. 49-50.  Lee indicated that another surgery was going to take place.  Tr. 48-49.  The ALJ indicated she wanted to review Dr. Ehredt's post-surgical records.  Tr. 51.  During the hearing, Lee signed medical authorizations requested by the ALJ.  Tr. 51-54.  Lee explained that she has to elevate her foot on a regular basis throughout the day because, when her foot is not elevated, she has a lot of pain.  Tr. 55.  The pain in Lee's foot is aggravated by cold and rainy weather.  Tr. 56.

---

[4] The March 2016 surgery was the biopsy of the soft tissue mass on Lee's left foot.  Tr. 49, 634.

Lee also testified about her mental health.  Tr. 54.  She relayed that she heard voices telling her to hurt herself.  Tr. 54.  Lee takes prescription psychiatric medication.  Tr. 55.  She could not recall the names of all of her medications but did recall that her doctor had prescribed Risperdal.  Tr. 55.  Lee's medications caused her to shake.  Tr. 56.  Lee occasionally has nightmares.  Tr. 55.  She uses a CPAP machine for sleep apnea.  Tr. 55.  Lee often recalls the incident when she suffered a gunshot wound.  Tr. 56.  On a monthly basis, Lee was attending counseling at Children and Family Services for her mental health issues.  Tr. 62-63.  She was also receiving medication from Children and Family Services.  Tr. 62.  The ALJ indicated that she wanted to make sure that she had the mental health records.  Tr. 57.

At the close of the hearing, the ALJ indicated that she was going to continue the hearing to see what medical records came in.  Tr. 70.  Depending on what information was learned from the additional medical records, the ALJ indicated she would make a determination as to whether a further hearing with additional testimony from Lee or a vocational expert was necessary.  Tr. 70.

### September 21, 2016, hearing

During the September 21, 2016, hearing, the ALJ referenced Lee's recent treatment on her left foot, noting that Lee had surgery on her left foot in early August 2016 to remove a lipoma (Tr. 75-76, 979), and she also underwent a debridement in late August 2016 (Tr. 75-76, 1112).  Lee had a wound VAC at her surgical site because she had a hole in her foot for drainage.  Tr. 94.  Lee's doctors estimated that she would need to have the wound VAC for about two months.  Tr. 94.  With the wound VAC on, Lee was not able to put any pressure on or walk on her foot.  Tr. 94-95.  Lee was informed by her doctors that she was going to need a skin graft because her foot was completely open so she was not sure how long she was going to have to be

non-weight bearing.  Tr. 102.  As a result, she was receiving home health care services.  Tr. 95.
A nurse was visiting Lee three times each week to change her dressings and empty the fluids.
Tr. 95.  Also, she received home health care assistance with bathing.  Tr. 95.  Lee's sister was
helping with other things at home.  Tr. 95.  Lee's father and a neighbor also helped Lee at home.
Tr. 103.  Lee was transported to doctor appointments by family or a transportation service.  Tr.
103-104.  Lee was taking Percocet and Ibuprofen for her pain.  Tr. 102.

Lee explained that she filed for disability because her foot was bothering her and she was
having a lot of mental problems.  Tr. 95.  She did not want to be around a lot of people and she
was having panic attacks.  Tr. 95-96.  She was hospitalized once while she was living in
Oklahoma for a panic attack.  Tr. 97-98.  Lee had previously taken Seroquel for her mental
health issues but was currently taking Risperdal and Trazadone.  Tr. 103.

Lee needed to use a wheelchair following her lipoma surgery.  Tr. 98.  Prior to her lipoma
surgery, Lee was wearing a brace and used a cane that had been prescribed to walk around.  Tr.
98.  Lee explained that she was not able to perform sit down work because, when she sat for too
long her back hurt.  Tr. 99.  Lee's doctors have advised her to elevate her legs any chance that
she has.  Tr. 99.  Cold and rainy weather aggravates Lee's pain to the point where she cannot
walk at times.  Tr. 99-100.

Lee explained that the initial injury to her foot was caused by a gunshot.  Tr. 100.  She
indicated that there were seven people who were shot and one man was killed.  Tr. 100.  Lee has
been diagnosed with posttraumatic stress disorder, which she said is due to the shooting incident
and "past issues."  Tr. 100.  Lee sees things that are not there.  Tr. 100.  For example, she sees
spots and other things on walls that are not there.  Tr. 100.  She also hears voices telling her to
hurt herself.  Tr. 100.  Lee has trouble sleeping which she attributes to both her physical and

mental issues.  Tr. 100-101.  Lee has approximately four stairs going into her home.  Tr. 101. Once she is inside her home, everything is on one level.  Tr. 101.  She has some difficulty getting around her house because of the length of the house.  Tr. 101.  Lee does not do much during the day.  Tr. 103.  She props her foot up, watches television and sleeps.  Tr. 103.  Lee was advised to start using a CPAP machine around May or June of 2016.  Tr. 104-105.

### 2. Vocational expert's testimony

Vocational Expert Ted Macy ("VE") testified at the September 21, 2016, hearing.[5]  Tr. 106-110.  The VE explained that Lee's past work included work as (1) a packager, an unskilled, medium level job that Lee may have performed at the light level; (2) production machine operator, a semi-skilled, medium level job; (3) home health attendant, a semi-skilled, medium level job; and (4) dietary aide, an unskilled, medium level job.  Tr. 107.

The ALJ asked the VE to assume an individual who could occasionally lift and carry ten pounds and frequently lift less than ten pounds; limited to standing and walking two hours per day; can sit about six hours per day; unlimited ability to push and pull; can never climb ladders, ropes and scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch and crawl; unlimited balancing; limited to simple, routine type work; limited to superficial interactions with supervisors and coworkers, meaning no mentoring or conflict resolution, and no interaction with the general public.  Tr. 107-108.  The VE indicated that Lee's past work would exceed the limitations contained in the hypothetical but there would be other sedentary, unskilled jobs available to the described individual, including (1) table worker; (2)

---

[5] Vocational expert Mark Anderson testified at the May 9, 2016, hearing.  Tr. 63-70.  As reflected herein, the ALJ held a subsequent hearing September 21, 2016.  VE Ted Macy testified at that subsequent hearing.  In rendering her decision, the ALJ relied upon VE Macy's testimony.  Tr. 28.  Accordingly, VE Anderson's testimony is not recounted herein.

final assembler; and (3) bonder.  Tr. 108-109.  The VE provided national and statewide job incidence data for the jobs identified.  Tr. 108-109.

The ALJ then asked the VE whether his testimony would differ if the described individual would also be off task ten percent of the day.  Tr. 109.  The VE indicated that most unskilled work would tolerate an individual being off task ten percent of the time (outside of regular breaks and meal time).  Tr. 109.  Thus, the VE indicated that the three jobs previously identified would remain available to the individual with the added limitation of being off task ten percent of the time.  Tr. 109.  The VE indicated that an off-task limitation of greater than ten percent would be a problem.  Tr. 109.

Lee's counsel asked the VE to consider an individual limited to sedentary work who needed to elevate her feet at the work station on an as needed basis.  Tr. 110.  The VE indicated that he has observed situations where an individual is able to elevate her feet as needed.  Tr. 110. However, the VE indicated that, in many situations, it would be prohibited by work rules or would not be safe and, therefore, in most settings, needing to elevate one's feet would be a problem such that most jobs would be eliminated.  Tr. 110.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[6] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

---

[6] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In her December 16, 2016, decision, the ALJ made the following findings:[7]

1.   Lee meets the insured status requirements of the Social Security Act
     through December 31, 2016.  Tr. 20.

2.   Lee has not engaged in substantial gainful activity since May 9, 2013, the
     alleged onset date.  Tr. 20.

3.   Lee has the following severe impairments: status post gunshot wound to
     the left foot; anxiety disorder; depressive disorder; posttraumatic stress
     disorder; insomnia; and history of substance abuse.  Tr. 20-21.

4.   Lee does not have an impairment or combination of impairments that meets
     or medically equals the severity of the listed impairments.  Tr. 21-22.

5.   Lee has the RFC to perform sedentary work except she can never climb
     ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can
     occasionally stoop, kneel, crouch and crawl; limited to simple, routine type
     work; limited to superficial interactions with supervisors and coworkers,
     defined as no mentoring or conflict resolution; and can never interact with
     the general public.  Tr. 23-27.

6.   Lee is unable to perform past relevant work.  Tr. 27.

7.   Lee was born in 1973 and was 40 years old, which is defined as a younger
     individual age 18-44, on the alleged disability onset date. Tr. 27.

8.   Lee has at least a high school education and is able to communicate in
     English.  Tr. 27.

9.   Transferability of job skills is not material to the determination of
     disability.  Tr. 28.

10.  Considering Lee's age, education, work experience, and RFC, there are
     jobs that exist in significant numbers in the national economy that Lee can
     perform, including table worker, final assembler, and bonder.  Tr. 28-29.

---

[7] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Lee had not been under a disability, as defined in the Social Security Act, from May 9, 2013, through the date of the decision.  Tr. 29.

## V. Plaintiff's Arguments

With respect to her physical impairments, Lee argues that the RFC is not supported by substantial evidence because the ALJ failed to develop the record and obtain a functional assessment from a treating or examining source and relied on her own lay interpretation of the medical data for the two-year period following the reviewing physicians' review.  Lee also argues that the RFC is not supported by substantial evidence because the ALJ did not consider the impact of Lee's use of a cane on the RFC determination.

With respect to her mental impairments, Lee argues that the RFC is not supported by substantial evidence because the RFC limitation of "simple, routine, repetitive tasks" does not account for moderate limitations in concentration, persistence, or pace as found by the ALJ and supported by the reviewing physicians' opinions.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.    The undersigned recommends that the Court reverse and remand this case because it cannot be determined whether the physical RFC is supported by substantial evidence**

Lee argues that reversal and remand is warranted because the ALJ did not obtain a functional assessment from a treating or examining source and instead relied on the opinions of state agency reviewing physicians who did not review the entire medical record and on her own interpretation of the medical evidence for the period of time following the reviewing physicians' review. Doc. 13, pp. 15-19, Doc. 17, pp. 1-3. She also argues that reversal and remand is warranted because the ALJ failed to consider the impact of her use of a cane on the RFC determination. Doc. 13, pp. 19-20.

An ALJ is not precluded from considering and relying upon opinions of state agency reviewing physicians even when those physicians have not reviewed the entirety of the record. *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more

detailed and comprehensive' case record.") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)).  "Where a non-examining source did not review a complete case record, [courts] require some indication that the ALJ at least considered these facts before giving greater weight to that opinion."  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (internal quotations omitted)).  In all cases, the RFC must nevertheless be supported by substantial evidence.

Here, the only medical opinions in the record relating to Lee's physical impairments were opinions rendered by state agency reviewing physicians in November 2014 and February 2015. The ALJ considered and weighed them stating,

> As for the opinion evidence, the state agency medical consultants opined that the claimant is capable of sedentary work, can never climb ladders, ropes or scaffolds and can only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl (B4A; B5A; B6A; B7A).  These opinions are given great weight because they are consistent with the available evidence.  The claimant has consistently noted left foot pain and has been treated with medication (e.g. B1F; Bl 7F).  X-rays of the left foot from September 2015 showed degenerative and post-surgical changes and metallic fragments (Bl 7F/7).  An MRI of the left foot from February 2016 revealed the presence of a lipoma (B9F/3).  The claimant eventually underwent excision of the lipoma from her left foot in August 2016 as well as a follow up debridement procedure (B20F/32-34; B23F/8-9).  A wound VAC was placed in September 2016, but examination found no signs of infection (B23F/10).  She is expected to make a full recovery from this recent surgery.  Previously, she had normal gait and strength until the development of the lipoma.  It is anticipated she will return to her normal baseline and make a full recovery within several months.

Tr. 26.

The ALJ described medical evidence that post-dated the state agency reviewers' opinions.  The ALJ then proceeded to provide *her* opinion regarding Lee's expected recovery. The ALJ provided no record citations for her conclusions that Lee "is expected to make a full recovery from this recent surgery" and "[i]t is anticipated she will return to her normal baseline and make a full recovery within several months."  Tr. 26.

As reflected in the record, following the state agency reviewers' opinions, Lee's foot impairment worsened to the point of requiring multiple surgeries and use of a brace and a prescription for a cane.  Tr. 602, 604, 606, 729, 1107, 1114.  Following a biopsy of the soft tissue mass on Lee's left foot, Lee underwent surgery to excise a lipoma.  Tr. 634, 1107, 1109.  Then additional surgical intervention was required to debride dead tissue from Lee's foot.  Tr. 1111, 1113-1115.  Following the debridement, Lee required a wound VAC, which had to be emptied of fluids three times each week by a home health care worker.  Tr. 95, 1113-1114, 1115. Additionally, treatment notes from a post-operative visit on September 12, 2016, indicate that further surgical planning was likely.  Tr. 1115.  While the ALJ accurately stated that there were no signs of infection, without further explanation by the ALJ or a supporting medical opinion, the undersigned is unable to discern a basis upon which the ALJ concluded that Lee is expected to make a full recovery from her recent surgery and return to her normal baseline.

Additionally, as indicated in SSR 96-9p, 1996 WL 374185, **7-8 (1996), the use of a medically required hand-held assistive device may erode the sedentary occupational base.  Here, the ALJ notes that a cane had been prescribed.  Tr. 24.  However, the ALJ provides no further discussion of Lee's need to use a cane and the impact of that use on the RFC assessment. Without more, the ALJ is unable to meaningful assess whether the RFC, which includes no restriction to account for the use of a cane, is supported by substantial evidence.

Considering the foregoing, the undersigned recommends that this case be remanded for further analysis of the evidence that post-dated the state agency reviewers' opinions as well as further analysis of Lee's use of a cane and the effect on the RFC assessment.

Lee also contends that the ALJ erred because she did not obtain a consultative examination or seek a medical opinion from Lee's treating sources.   An ALJ has the authority,

but is not required, to obtain a consultative examination unless such an examination is necessary to allow an ALJ to make the disability determination. *Landsaw v. Sec'y HHS*, 803 F.2d 211, 214 (6th Cir. 1986)).  While a consultative examination is not mandated under the regulations, considering the lack of medical opinion evidence relating to the period of time when Lee's foot impairment worsened, the undersigned recommends that, on remand, the Commissioner be required to further assess whether a consultative examination is necessary.

**B.     The Court should find no error with the ALJ's assessment of Lee's mental health impairments**

Lee argues that the RFC is not supported by substantial evidence because the RFC limitation of "simple, routine, repetitive tasks" does not account for moderate limitations in concentration, persistence, or pace as found by the ALJ and supported by the reviewing physicians' opinions.  Doc. 13, pp. 20-22.

Relying in part on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Lee argues that, although the ALJ concluded that Lee had moderate limitations in concentration, persistence or pace, the ALJ did not adequately account for those limitations in the RFC or VE hypothetical. Doc. 13, pp. 20-22.

In *Ealy*, the ALJ relied upon a physician's assessment that included speed and pace based restrictions.  594 F.3d at 516.  However, the ALJ did not rely on a vocational expert hypothetical containing a fair summary of those speed and pace based restrictions.  *Id.*  Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and instructions.  *Id.*  The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination.  *Id.*at 516-517.

In this case, the ALJ's mental RFC contained the following limitations: "limited to simple, routine type work; limited to superficial interactions with supervisors and coworkers, defined as no mentoring or conflict resolution; can never interact with the general public."  Tr. 23.  Lee has failed to explain how the evidence supports the need for additional mental RFC limitations.  Further, when formulating the RFC, the ALJ considered and provided great weight to the opinions of the state agency reviewing psychologists. Tr. 26.  The reviewing psychologists concluded that Lee could perform simple tasks with routine supervision; she could relate to supervisors and peers on a superficial work basis but she could not relate to the general public; and she could adapt to a work situation.  Tr. 150, 187.  Lee has not challenged the ALJ's consideration or reliance on these opinions nor has she shown that these opinions fail to support the mental limitations contained in the RFC.  Additionally, courts have concluded that *Ealy* did not establish an absolute rule.  For example, when finding a claimant's reliance on *Ealy* misplaced, the Sixth Circuit observed, "Case law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in concentration, persistence and pace."  *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 635 (6th Cir. 2016) (unpublished); *see also Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966, *4 (N.D. Ohio Oct. 18, 2011) (finding that "*Ealy* stands for a limited, fact-based, ruling in which the claimant's particular moderate limitations required additional speed - and pace-based restrictions").

Based on the foregoing, the undersigned recommends that the Court find that the ALJ's mental RFC assessment is supported by substantial evidence and reject Lee's claim that reversal and remand is warranted for further assessment of her mental health impairments or for further vocational expert testimony regarding her mental health limitations.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision.

November 30, 2018

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).